**SO ORDERED.**

**DONE and SIGNED August 24, 2022.**



_____
**JOHN S. HODGE**
**UNITED STATES BANKRUPTCY JUDGE**

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case Number: 90-13449 |
| | § | |
| Patrick L. McConathy | § | Chapter 7 |
| Patricia Chapman McConathy | § | |
| Debtors | § | |
| | § | |

### <u>**Memorandum Ruling**</u>

Decades after this bankruptcy case was closed, Debtor[1] and other parties

filed a lawsuit in Kansas seeking over $7 million from certain oil companies. In the

lawsuit, Debtor asserted ownership to undivided working interests and leasehold

rights covering over 3,000 acres. Debtor claimed to have owned the mineral rights

continually since 1987. He also claimed that he is the successor to a partnership

which is listed in the chain of title as the owner of the mineral rights.

---

[1] Patrick L. McConathy is referred to as "<u>**Debtor**</u>", or with his wife, Patricia Chapman McConathy, "<u>**Debtors**</u>."

In a prior ruling, this court held that: 1) notwithstanding the closure of the bankruptcy case, the causes of action asserted by Debtor remained as property of the estate because he failed to disclose the mineral rights or his interest in the partnership and the trustee did not administer those assets while the bankruptcy case was open; 2) Debtor and his counsel violated the automatic stay by asserting causes of action which were owned exclusively by the estate; and 3) monetary sanctions should be imposed against Debtor's litigation counsel, Jeffery L. Carmichael ("**Carmichael**") and Jonathan Schlatter ("**Schlatter**"), for their violation of the automatic stay.

Carmichael and Schlatter pursued claims that Debtor did not own. They also pursued claims on behalf of a partnership that no longer existed, a fact that was known to them but concealed from the defendants. These actions violated the automatic stay because the causes of action belonged exclusively to the bankruptcy estate. To make matters worse, during the litigation, they repeatedly flip-flopped their positions to suit the argument of the day regarding the ownership of the mineral rights and the existence of the partnership. This forced the attorneys for the defendants to do extra work at nearly every juncture.

After finding that sanctions should be imposed against Debtor's litigation counsel, the court indicated that it would use compensatory attorneys' fees as the measure of sanctions in this case. The court required the defendants to file a fee application to justify their fees. According to the fee application, the defendants incurred over $585,000.00 in litigation expenses resulting from the stay violation.

There are two issues before the court. First, whether the claimed litigation expenses were incurred solely because of the violation of the stay. Second, whether the litigation expenses were reasonable.

For the reasons set forth below, the court concludes that the defendants incurred $67,868.10 in reasonable litigation expenses as a result of the violation of the stay. Sanctions will be imposed in that amount.

## Background

Pursuant to Fed. R. Bankr. P. 7052, made applicable to contested matters by virtue of Fed. R. Bankr. P. 9014, the court makes the following findings:

1. On December 31, 1990, Debtors commenced this case under chapter 7 of the Bankruptcy Code. Thus, all assets owned by Debtors as of that date became property of their bankruptcy estate.

2. Debtor did not disclose in his bankruptcy schedules that he claimed ownership to undivided working interests and leasehold rights covering over 3,000 acres in various tracts in Kearny County, Kansas (the "**mineral rights**"). Further, Debtor did not disclose that he claimed an interest in McConathy Oil & Gas, Co., a Louisiana partnership (the "**Partnership**").

3. In 2015, American Warrior, Inc., Heartland Oil, Inc. and Mid-Continent Resources, Inc. (collectively "**AWI**") filed a partition action in state court in Kearny County, Kansas, case 15-CV-08 (the "**Partition Lawsuit**") against various owners of working interests in mineral leases.

4. Thereafter, Carmichael and Schlatter became aware that title to a portion of

a relevant leasehold interest at issue in the Partition Lawsuit was held in the name of the Partnership rather than "McConathy Production Company, Inc." which was the entity named in the Partition Lawsuit.

5. As part of their title examination, Carmichael and Schlatter contacted Debtor. Eventually, Debtor discussed the engagement of Carmichael and Schlatter to represent his interests pertaining to the Partition Lawsuit.

6. Before any engagement, Carmichael and Schlatter were aware that any working interests in the mineral rights that preexisted the filing of the bankruptcy case constituted property of the bankruptcy estate if they were not: a) listed in the bankruptcy schedules, or b) administered by the trustee while the case was opened. As early as May 2019, Carmichael and Schlatter were aware of the necessity to determine whether the mineral rights constituted property of the estate.

7. Despite being aware of Debtor's bankruptcy case and the need to review the bankruptcy schedules to ascertain the ownership of the mineral rights, on August 13, 2019, Carmichael and Schlatter filed a lawsuit against AWI on behalf of Debtor and the Partnership in the 25th Judicial District Court in Kearny County, Kansas in the case styled as *Foundation Energy Fund IV-A, LP, et al. v. American Warrior, Inc., et al*, Case 19-CV-0011 (the "**Kansas lawsuit**"). The lawsuit pursued rights in connection with property of the estate as Debtor claimed to have owned the mineral rights and the Partnership prior to the commencement of the bankruptcy case.

8. Carmichael and Schlatter did not attempt to obtain copies of Debtor's bankruptcy schedules from the court's record center until October 30, 2020, more than a year after the Kansas litigation was commenced.

9. AWI's counsel provided Debtor's counsel with the entire bankruptcy file on November 19, 2020. The bankruptcy schedules show that Debtor failed to list the mineral rights and his interest in, or involvement with, the Partnership.

10. From the beginning of their representation of Debtor, Carmichael and Schlatter were aware of the necessity to obtain the consent of the chapter 7 trustee to pursue causes of action arising from the mineral rights or the Partnership. In fact, their contingency fee agreement contained an express provision to "authorize Attorneys to obtain the consent and authorization of the bankruptcy trustee, Case 90-13449, Western District of Louisiana, to pursue said claims on behalf of Pat McConathy." Yet, they never contacted the trustee's counsel and they did not try to obtain the records of the bankruptcy case until sixteen months after they filed the lawsuit.

11. When Carmichael and Schlatter asserted the estate's causes of action, the automatic stay was in effect. They knew about the bankruptcy case. They had the duty not to violate the stay and had several means by which to ensure they did not do so.

12. After the bankruptcy case was reopened, the trustee obtained orders from this court to enforce the automatic stay to preserve the estate's causes of action. Eventually, the trustee compromised the estate's causes of action by

collecting $400,000.00 from AWI.

13. Following this court's ruling determining that Carmichael and Schlatter violated the automatic stay, AWI filed a fee application asserting that it incurred over $585,000.00 in fees and expenses in connection with its defense of the Kansas litigation and for matters related to this bankruptcy case. AWI contends that all fees and expenses set forth in the fee application were incurred as a result of the violation of the automatic stay.

14. The fees and expenses incurred by AWI are itemized in billing statements attached to the fee application. The billing statements contain time entries for each professional which provide a narrative summary of the work performed and an itemization of the number of hours expended in performing such services. Additionally, each time entry reflects the amount of compensation requested in connection with such time entry.

15. All fees and expenses set forth in the billing statements have been paid.

16. The court held an evidentiary hearing to determine the reasonableness of the litigation expenses and the imposition of monetary sanctions.

17. The court incorporates all findings made in its prior ruling. Doc. 321.

## Jurisdiction, Venue and Core Status

This court has jurisdiction pursuant to 28 U.S.C. § 1334(b) and by virtue of the reference by the district court pursuant to 28 U.S.C. § 157(a) and LR 83.4.1. Venue is proper in this district. 28 U.S.C. §§ 1408 and 1409(a). This matter constitutes a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G), and (O).

<h2 style="text-align:center">Conclusions of Law and Analysis</h2>

In a prior ruling, this court held that Carmichael and Schlatter violated the automatic stay when they filed a lawsuit on behalf of Debtor which asserted claims that belonged exclusively to the bankruptcy estate. Importantly, however, the court noted that they did *not* violate the stay by:

> 1) filing the lawsuit on behalf of the non-debtor co-plaintiffs, 2) prosecuting the claims held by the non-debtor co-plaintiffs, 3) attending a status conference held by the state court wherein they told the judge that the bankruptcy court had entered an order imposing a stay of the litigation, and 4) filing a "suggestion of death" in the record of the state court lawsuit after one of the non-debtor co-plaintiffs died. To the extent that any of these actions constituted an infraction of the stay (which the court seriously doubts), they constituted harmless error. ***Sanctions are not appropriate for these actions***.

*In re McConathy*, No. 90-13449, 2022 WL 1612447, at *9 (Bankr. W.D. La. May 20, 2022) (emphasis added).

The court stated that it will impose monetary sanctions against Carmichael and Schlatter "*for their violations of the automatic stay*" and instructed AWI to "file a fee application itemizing the attorneys' fees and expenses incurred *resulting from the violations of the automatic stay*." Doc. 322 at ¶¶ 5 and 6 (emphasis added).

The sanctions in this case are based on this court's civil contempt authority and its inherent sanction authority. Any award of attorneys' fees and expenses under a court's inherent authority must be limited to fees and expenses incurred "solely because of" the sanctionable conduct. *See Goodyear Tire & Rubber Co. v. Haeger*, 584 U.S. 101, 137 S. Ct. 1178, 197 L.Ed.2d 585 (2017) ("a federal court's inherent authority to sanction a litigant for bad-faith conduct by ordering it to pay the other side's legal fees ... is limited to the fees the innocent party incurred solely

because of the misconduct…").

In *Goodyear*, the Supreme Court made clear that a sanction must be compensatory rather than punitive in nature. 137 S. Ct. at 1182. A sanction counts as compensatory only if it is calibrated to the damages caused by the bad-faith acts on which it is based. As the Court stated:

> A fee award is so calibrated if it covers the legal bills that the litigation abuse occasioned. But if an award extends further than that—to fees that would have been incurred without the misconduct—then it crosses the boundary from compensation to punishment. Hence the need for a court, when using its inherent sanctioning authority (and civil procedures), to establish a causal link—between the litigant's misbehavior and legal fees paid by the opposing party.

*Goodyear*, 137 S. Ct. at 1186.

The court must establish a causal link between violations of the automatic stay and the legal fees paid by AWI. In *Goodyear*, the Supreme Court framed its causation standard as a "but for" test: "The complaining party … may recover only the portion of his fees that he would not have paid but for the misconduct." *Id.* at 1187 (citations and quotation marks omitted). The court continued:

> ***Th[e] but-for causation standard generally demands that a district court assess and allocate specific litigation expenses— yet still allows it to exercise discretion and judgment***. The court's fundamental job is to determine whether a given legal fee—say, for taking a deposition or drafting a motion—would or would not have been incurred in the absence of the sanctioned conduct. The award is then the sum total of the fees that, except for the misbehavior, would not have accrued. *See* [*Fox v. Vice*, 563 U.S. 826, 837–38, 131 S.Ct. 2205, 180 L.Ed.2d 45 (2011)] (providing illustrative examples). But … trial courts undertaking that task "need not, and indeed should not, become green-eyeshade accountants" (or whatever the contemporary equivalent is), *Id.*, at 838, 131 S.Ct. 2205. ***"The essential goal" in shifting fees is "to do rough justice, not to achieve auditing perfection***." *Ibid.* Accordingly, a district court "may take into account

[its] overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Ibid*. The court may decide, for example, that all (or a set percentage) of a particular category of expenses—say, for expert discovery—were incurred solely because of a litigant's bad-faith conduct. And such judgments, in light of the trial court's "superior understanding of the litigation," are entitled to substantial deference on appeal. [*Hensley*, 461 U.S. at 437, 103 S.Ct. 1933].

*Id.* (emphasis added).

To determine the amount of the sanction, the court will use a two-step process. First, it must "assess and allocate specific litigation expenses" to determine which fees "would or would not have been incurred in the absence of the sanctioned conduct." *Goodyear*, 137 S. Ct. at 1186. Second, it must determine the reasonableness of the fees.

### A. Assessment and Allocation of Specific Litigation Expenses Using the *Goodyear* "But For" Causation Test

The parties presented radically divergent views on whether there is a causal link between violations of the stay and the legal fees. AWI argues that it incurred over $585,000.00 in litigation expenses that were directly caused by the violation of the stay. In contrast, Carmichael and Schlatter argue that AWI incurred very little litigation expenses resulting from a stay violation.

### 1. Assessment of Specific Litigation Expenses

To evaluate the litigation expenses, the court categorized the time entries by subject matter. The court must assess the description of services rendered in each billing category to determine whether there is a causal link between the services rendered and the stay violation.

*Reopening of the Bankruptcy Case*

Carmichael and Schlatter concede that litigation expenses related to the reopening of the bankruptcy case satisfy the "but for" test. The fees incurred in this category include fees paid to AWI's litigation counsel and its bankruptcy counsel. These services included reviewing the relevant bankruptcy records, researching the interplay between bankruptcy law and state law regarding the Kansas litigation, and ultimately preparing and filing a motion to reopen the bankruptcy case. The services also included preparing an order for the bankruptcy court to enter to impose the stay and preparing and filing of a "Suggestion of Bankruptcy" in the Kansas litigation to notify all parties about the existence of the automatic stay.

*Services Rendered After the Bankruptcy Case was Reopened*

AWI incurred significant fees after the bankruptcy case was reopened, primarily regarding litigation over the applicability of the automatic stay to the claims asserted by non-debtor parties. Importantly, once the bankruptcy case was reopened, Carmichael and Schlatter ceased litigating Debtor's claims in state court.

To the extent that Carmichael and Schlatter were involved in efforts to modify the stay, their actions did not violate the stay. Simply put, a lawyer does not violate the stay by filing a motion to modify, terminate, or annul the stay.

There is no causal link between the services rendered by AWI's counsel after the reopening of the bankruptcy case and the violation of the stay. All fees and expenses incurred by AWI in this billing category must be excluded from the

calculation of the sanction.[2]

## *Defense of Non-Debtor Claims*

AWI incurred significant fees for services resulting from claims asserted by non-debtor parties. For example, at the fee hearing, AWI's attorney, Ben Jackson, testified that he spent considerable time trying to determine whether the "Foundation Parties" owned any interest in the "Partitioned Lands" which were at issue in the Kansas litigation. He testified that he prepared extensive discovery requests that were propounded to the Foundation Parties asking them to identify their ownership, if any, of working interest on a tract-by-tract basis. Doc. 347, Tr. 30. He also testified that he spent considerable time reviewing title documentation, prior title examinations, and documents at the courthouse to determine if the Foundation Parties had any legitimate claim of ownership of working interests. *Id*.

Mr. Jackson also testified that AWI's attorneys spent significant time trying to determine whether the Foundation Parties held a "net profits interest" in any of the subject properties. This issue eventually led AWI to file a motion to compel. Doc. 347, Tr. 33. Eventually, the Foundation Parties conceded that they did not hold a "net profits interest" in the subject properties.

The issue is whether the fees incurred for defending non-debtor claims resulted from the violation of the automatic stay (i.e. the assertion of the estate's

---

[2] AWI incurred $284,835.24 in litigation expenses after the bankruptcy case was reopened, consisting of $281,556.00 in fees and $3,279.24 in expenses. *See*, Doc. 327-1, item nos. 377-564 and 710-762 (totaling $83,430.00); Doc. 327-2 (entries after 1/22/21) (totaling $19,705.50); Doc. 327-3 (entries after 1/22/21) (totaling $178,420.50 in fees and $3,279.24 in expenses).

causes of action). AWI argues there is a causal link because the entire Kansas litigation was predicated on the claims asserted by Debtor and the Partnership. According to AWI, Carmichael and Schlatter would not have asserted any claims on behalf of non-debtor parties without filing claims on behalf of Debtor and the Partnership because said parties did not hold valid claims or because the value of such claims was relatively small in comparison to Debtor's claims. In AWI's view, everything Carmichael and Schlatter did was derived from their wrongful assertion of the estate's causes of action.

This court rejects AWI's argument for two reasons. First, this court expressly stated that "*sanctions are not appropriate*" against Carmichael and Schlatter for litigating claims on behalf of non-debtor parties. *In re McConathy*, No. 90-13449, 2022 WL 1612447, at *9 (Bankr. W.D. La. May 20, 2022) (emphasis added). Second, in the context presented here, the "but for" causation test requires a close causal connection between the fees incurred and the violation of the stay. The causation test advanced by AWI is boundless, to say the least.[3]

The court finds that many (if not most) of the services performed in the Kansas litigation, such as discovery and motion practice, involved claims asserted by non-debtor parties. Such services would have been performed regardless of the

---

[3] The boundlessness of AWI's theory of but-for causation is illustrated by this well-known proverb: "For want of a nail the shoe was lost. For want of a shoe the horse was lost. For want of a horse the rider was lost. For want of a rider the battle was lost. For want of a battle the kingdom was lost. And all for the want of a horseshoe nail." Benjamin Franklin, Poor Richard's Almanac, Preface: Courteous Reader (1758) (quotation omitted); *see also Holmes v. Sec. Investor Protection Corp.,* 503 U.S. 258, 287, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (Scalia, J., concurring) (" '[F]or want of a nail, a kingdom was lost' is a commentary on fate, not the statement of a major cause of action against a blacksmith.").

claims asserted by Debtor and the Partnership. Accordingly, all fees attributable to non-debtor claims should be excluded from the sanction calculation.

*Fees Incurred in a Different Lawsuit*

There is a long history of litigation between AWI and the "Foundation Parties" that is separate from the Kansas litigation and the Partition Lawsuit. In 2018, AWI sued the Foundation Parties and other companies to partition working interests and leases. In his testimony at the fee hearing, AWI's attorney described the 2018 litigation as "extensive" and "contentious." Doc. 347, Tr. 27.

Although AWI and the Foundation Parties were able to resolve their dispute in the 2018 litigation, they became aware of a so-called "scrivener's error" contained in an order entered in the Partition Lawsuit (which was filed in 2015). The error became relevant in the Kansas litigation (filed in 2019) because it involved a tract in which the Foundation Parties claimed to hold a working interest. Eventually, AWI resolved the error by filing a motion in the Partition Lawsuit which sought the entry of an order "nunc pro tunc" to fix the alleged scrivener's error. Doc. 341-1. Carmichael and Schlatter opposed the entry of that order.

Regardless of the relevance of the scrivener's error to the Kansas litigation, it is undeniable that AWI made the error long before the Kansas litigation was filed. Thus, fees incurred to correct the scrivener's error were not caused by a violation of the stay. Moreover, the correction of the so-called "scrivener's error" related to claims asserted by non-debtor parties. Thus, any fees incurred to correct the scrivener's error or re-examine title for non-debtor parties should be excluded from

the sanction calculation.

*Counterclaims, Crossclaims, and Third-Party Claims Filed by AWI*

AWI's attorneys spent significant time preparing and litigating numerous counterclaims, crossclaims, and third-party claims against various parties, including non-debtor parties. Services rendered in connection with these claims were not caused by a violation of the stay. AWI should bear its own attorneys' fees incurred to pursue its own claims. These fees should be excluded from the sanction calculation.

*Partnership Issues*

AWI's attorneys spent a significant portion of their time dealing with issues related to the Partnership. Some of their services were performed as a direct result of the wrongful assertion of the estate's causes of action, but most were not. As a result, some of the fees incurred by AWI should be included in the sanction calculation, but most should be excluded.

To prevail in the Kansas litigation, plaintiffs had to establish three elements: 1) they were the owners of the mineral rights, 2) they were "reasonably ascertainable", and 3) AWI did not exercise "reasonably diligent efforts" to serve them with the petition in the Partition Lawsuit. Debtor happened to be right about the third element because AWI made no effort whatsoever (much less a "reasonably diligent" one) to serve the Partnership's successors or assigns. Instead, AWI sued and served an entity (McConathy Production Company, Inc.) that had a similar name to the Partnership. At the fee hearing, AWI's attorney conceded that the

defendant named in the lawsuit (McConathy Production Company, Inc.) "is not vested of record with the working interest." Doc. 347, Tr. 76.

When AWI obtained a judgment against the wrong party in the Partition Lawsuit, it resulted in a potential cloud on the title. This defect was caused by AWI, not Carmichael and Schlatter. To cure the title defect, AWI had to: 1) determine the identity of the Partnership's successors or assigns and 2) acquire their working interests. As AWI's attorney noted in his testimony, the working interests previously held by the Partnership did not "vaporize" and automatically transfer to AWI. Doc. 347, Tr. 60 (paraphrasing Schlatter's position in the litigation).

The Partnership issues were enormously complex and were complicated by the lack of documentation, the passage of time, deaths of various "partners" and significant changes to the statutory law governing the Partnership during the relevant period. For example, to ascertain the identity of the "partners" and the status of the Partnership, AWI was required to conduct a detail examination of the title in surrounding areas as well as undertake significant investigatory research. Eventually, AWI was able to acquire the rights of some, but not all, of the "partners" in the Partnership.

While Carmichael and Schlatter may have made this problem more difficult (i.e. expensive) to fix, they did not cause the underlying problem of the necessity to account for the Partnership's working interest ownership. The violation of the stay was not the "but for" cause of most of the fees incurred by AWI related to the Partnership. Fees incurred to cure the title defect (including re-examination of the

title, meetings with former partners of the Partnership to acquire their interests and preparing acts of assignments from the former partners to AWI) should not be part of the sanction calculation. See, for example, Doc. 327-1, items 215, 237-241.

On the other hand, a portion of the fees incurred by AWI pertaining to the Partnership were directly attributable to the violation of the stay. Despite Debtor not personally appearing in the record title to the mineral rights in 2019, Carmichael and Schlatter filed suit on behalf of both Debtor and the Partnership claiming that they each owned a working interest. The petition did not specify the parcel each owned or how much each claimed to own. Although Carmichael and Schlatter knew from the beginning the Partnership was no longer in existence, this fact was not shared with AWI's counsel.

Carmichael and Schlatter knew that Debtor did not have the ability to hire counsel on behalf of a defunct partnership, but they did not so advise AWI's counsel. When AWI asked about the identities of the partners during the pretrial discovery phase of the litigation, Carmichael and Schlatter would not respond. They also instructed AWI's counsel not to contact any of the former partners of the Partnership, threatening disciplinary action if such contact occurred. As a result, AWI's counsel spent significant time trying to ascertain the identities of the former partners and trying to decipher the status of the Partnership. Eventually, AWI filed third-party claims against suspected partners.

After AWI contacted the unrepresented "partners" in the Partnership, Carmichael and Schlatter changed the ownership theory which constantly evolved

over time. As a result of the shifting ownership theories advanced by Carmichael and Schlatter, AWI incurred significant fees because its counsel had to prepare different analyses depending on the evolving claims. Such fees should be included in the sanction calculation because Carmichael and Schlatter should not have asserted the estate's causes of action.

### 2. Allocation of Litigation Expenses

Having assessed specific litigation expenses to determine whether there is a causal link between the expenses and the violation of the stay, the court must now allocate fees attributable to the violation of the stay.

In this case, exact apportionment is not possible because AWI's attorneys used "block billing" practices (i.e. billing a large number of hours for multiple tasks). As a result, the court will estimate the percentage of fees resulting from the violation of the stay. In *Goodyear*, the court expressly stated that a court "may use estimates in calculating and allocating an attorney's time." 137 S. Ct. at 1187. Applying the "rough justice" principles from *Goodyear*, the court estimates that twenty (20%) percent of the services rendered by AWI's attorneys prior to the reopening of the bankruptcy case were caused by the violation of the stay.

AWI incurred $571,962.00 in fees. After excluding all fees ($281,556.00) incurred following the reopening of the bankruptcy case and allocating 20% to the violation of the stay, the court allocates $58,081.20 for fees. AWI incurred $13,066.14 in expenses. After excluding all expenses ($3,279.24) incurred following the reopening of the bankruptcy case, the court allocates $9,786.90 for expenses

resulting from the stay violation. Therefore, the total amount of fees and expenses incurred resulting from the stay is $67,868.10.

**B. Reasonableness of Fees**

Now that the court has addressed which fees are attributable to the violation of the stay, the court must determine whether the amount of fees claimed is reasonable. In the Fifth Circuit, reasonable attorneys' fees are calculated using the lodestar method. *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 323–24 (5th Cir. 1995). To determine the lodestar, the court must determine each attorney's reasonable hourly rate and then that rate is multiplied by the hours reasonably spent by each attorney.

Carmichael and Schlatter stipulated that the hourly rates charged by AWI's attorneys were reasonable and justified by the twelve factors set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). The factors considered in *Johnson* include: (1) the time and labor required to represent the client or clients; (2) the novelty and difficulty of the issues in the case; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney; (5) the customary fee charged for those services in the relevant community; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or circumstances; (8) the amount involved and the result obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.* at 717–19.

The only remaining issue for the court to decide is the reasonableness of each attorney's time spent on services rendered solely because of a violation of the stay. After careful review of the billing statements, the court has determined that the hours spent by each attorney on matters attributable to the stay violation were reasonable under the circumstances. The court has determined that such services: (i) were necessary for the representation of AWI in the state court litigation or beneficial at the time at which the services were rendered; (ii) were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; (iii) were actually rendered; and (iv) were not unnecessarily duplicative of services performed by other attorneys.

## C. AWI's Possession of Debtor's Bankruptcy Records

The billing statements attached to AWI's fee application show that its attorneys obtained copies of Debtor's bankruptcy records in the early stages of the Kansas litigation. Carmichael and Schlatter argue that AWI had the ability to review the records to determine for itself that the causes of action belonged exclusively to the bankruptcy estate. Thus, they argue that sanctions should not be imposed or, alternatively, should be significantly reduced.

AWI's possession of Debtor's bankruptcy records was not known to this court at the time that it entered an order holding Carmichael and Schlatter in civil contempt. In fact, the court was under the impression that Carmichael and Schlatter had obstructed AWI's effort to obtain information about Debtor's

bankruptcy case. It turns out, AWI had the bankruptcy records the entire time.

Notwithstanding AWI's possession of the bankruptcy records, Carmichael and Schlatter violated the stay by filing causes of action which belonged exclusively to the estate. Their pursuit of those claims, including their shifting ownership theories regarding the mineral rights, caused AWI's attorneys to do extra work that they would not have otherwise done. The review of the bankruptcy records by AWI's attorneys would not have led them to conclude that the Partnership terminated in 1987 or that there was a "joint venture" which owned the mineral interests. Had they reviewed the records, however, they could have concluded that Debtor lacked standing to pursue claims on his own behalf or on behalf of the Partnership.

The problem in this case is that Carmichael and Schlatter repeatedly changed their ownership theories regarding the mineral rights. At first, they claimed that Debtor and the Partnership each owned an indeterminant portion of the mineral rights. Then, they claimed that Debtor did not own any of the mineral rights, but he was the "managing partner" of the Partnership which owned the minerals. Then, they claimed that they represented the Partnership and all of its partners, but refused to identify the partners or whether any of them had filed bankruptcy. Then, they claimed that the Partnership terminated in 1987 and that Debtor was its sole successor, having acquired all partnership interests from his former partners even though Debtor had no documentation to establish such a claim. Finally, after a year into the litigation, they claimed that mineral rights were owned by a joint venture in which Debtor was a "participant."

The changing ownership theories are alone sufficient to justify the imposition of sanctions for violation of the stay as each theory involved the assertion of a cause of action which belonged exclusively to the estate. Nevertheless, the court gave serious consideration to the fact that AWI obtained the bankruptcy records in the early stages of the litigation. The court has taken this point into consideration in concluding that 20% of the total amount charged by AWI's attorneys is a reasonable allocation of the attorneys' fees attributable to the violation of the stay.

## Conclusion

For the reasons set forth above, the court will impose monetary sanctions against Carmichael and Schlatter, *in solido*, in the amount of $67,868.10, representing $58,081.20 for fees and $9,786.90 for expenses resulting from the stay violation. The sanctions should be paid to AWI.

The court will enter a separate order in accordance with this ruling.

###